Good morning, your honors. May it please the court. I'm Joe Dilo. I am an assistant attorney general with the state of Arizona. And, um, this is I'd like to reserve three minutes if I if I could, your honor. Um, this is an interlocutory appeal that the defendants have brought in a qualified immunity, qualified immunity issue. Um, Mr Fierro, um, sued under 1983 a number of prison officials seeking damages, um, under 1983. Um, let me let me ask you to see if we got our numbers right. Um, the following are for my notes are not before us. McCarville and Schuster. Yes, your honor. McCarville and Schuster were just ones who were still before us or coffee. Forrester Ochoa Pruitt Sanders and Smith. That is correct. I've got the right lineup. You've got the right. Okay, thanks. Um, what the district court didn't do in this case was the district court didn't take an individualized approach. Um, and this court has made it clear that in 1983 claims were damages are sought against a number of defendants. Um, that it must take an individualized approach. Um, if it had taken that individualized approach, I'm convinced that it would have gotten to a different result than it got to when you say I'm sorry when you say I want to ask why, too, because when you say individualized approach, exactly, I want to know exactly what you mean when you let me give you an example. One of the defendants is Ochoa. Um, and and Ms Ochoa was a deputy warden at the Cimarron unit in 19. I'm sorry, in 2012. Um, when when Mr Fiero was housed there, he asked for protection. Ms Ochoa, the deputy warden. Actually, he was isolated. He was isolated. He was protected. And Ms Ochoa started the review process. Um, and she had the S. S. U. Officers look into this and do up a report. So she's presented with a body of evidence after S. S. U. Did their report and she had on one hand, Mr Mr Fiero's claims that, um, he was targeted by the border brothers. And on the other hand, she had the information that she received from the S. S. U. Saying there's no confirmed statewide threat here and there's no gang connection. So she had those two pieces of evidence. And when she she looked at that, she considered that and she concluded she concluded and it's clear that she concluded and it's not disputed that there was no statewide threat to Fiero, that there was no gang related activity. So she didn't in what she did was she recommended alternate placement protection. Uh, what she didn't do was not just deny protection. She recommended alternate alternate housing, and she recommended that Mr Fiero be transferred away from the prison and away from the confirmed threat that faced him. But I'm a little aggregation decision work ship worksheet that the inmate did not claim that he acted as an informant in the past or provide any reason why others might think he is a snitch. But he said that at the first request, he didn't say that at the first request. Is your claim that Ochoa didn't read the documentation as to Fiero in his first request? No, Your Honor, that's not my claim. Then she can be disbelieved as to her claim that she doesn't know why he was claiming protective custody. She knew why he he said he was a snitch. It was self reported. He he he claimed that at the previous yard that somebody had called him a snitch, that he'd been labeled as a snitch. But the S. S. U. raises some questions, though. I mean, you're didn't sound like from the because that's not the reasons doesn't seem like that was the reasons that they gave. I mean, it seems like you're assuming he was a snitch. They made a determination or at least, you know, because of that, that they moved him. It's not like they're saying, Hey, we don't believe he was a snitch, so we're not gonna do anything. So I don't think you can have it both both both ways here. But I'm curious to see what your position is. That's fine, Your Honor. I concluded, or at least they didn't have any confirmation that he was a snitch. Well, then why move him? Well, in the case at Cimarron, where Ochoa was the deputy warden, he had gotten into a fight with his cellmate. Well, okay, so you're saying there were I guess there were more than one or two bases to move him, but they ended up making a decision. And it seems like he's offering up a lot of reasons. And don't we have to take it in the light most favorable to him at this point? Yes. Okay, so if we take it in the light most favorable to him, he's a snitch and he has these other reasons that apparently they based on. So I'm not sure that that helps you. But I'm looking, I'm just trying to figure out how we can conclude that Mr. Fierro did not face a substantial risk of harm from these Border Brothers and that the defendants did not know about the harm. When you look at a number of things here, he was assaulted by a member of the Border Brothers gang in the Lewis, I guess, Lewis-Rast unit. He was assaulted by two members of the Border Brothers gang in the Tucson-Cimarron unit. He twice reported receiving a threatening note, allegedly from the Border Brothers gang. And then he requested protective custody six times because of a perceived fear at several different units of the Border Brothers gang. Is your individualized approach the answer to that? I mean, is that what you're standing on? I think that's part of the answer, Your Honor. On the first yard Mr. Fierro was at, he actually got into a fight with his cellmate. He wasn't assaulted. He got into a fight. On the second yard he was at, and this gets to your credibility question, the second yard that he was at, he did allege that two or three inmates pushed their way into his cell and that they assaulted him. He did allege that. He didn't have any injuries. He had a slight laceration on his forehead, a slight cut on his forehead, and I believe the medical records said he had a slight swelling on the top of his hand near his wrist. The deputy warden took that into account. The deputy warden took that into account from a credibility standpoint. That was all considered and I don't believe the district court took any of that into consideration. The district court did not take into consideration the information that the individual defendants got from their individual SSU units that said that there is no confirmed threat. And I guess the other question I have is why did the officials transfer Mr. Fierro back to the Tucson-Cimarron unit, and I think it was September of 2013, and then back to the Lewis-Moore unit in December of 2013. It may be September 2012, I can't remember, in December of 2013, when Mr. Fierro had previously been assaulted at those units, and apparently the officials had determined that he needed to be moved. These officials didn't transfer him, Your Honor. Well, but so it's just, we don't hold the whole organization, I mean, so that can always be a defense is that you can have enough different people, they don't have to review his record, and they can just make a determination and they'll never be held accountable? No, Your Honor. Each one of these defendants did review his record. And I go back to Ochoa, and I just use Ochoa because she's the simplest example. Ochoa's involvement in Mr. Fierro's two-year protective custody process ended when she recommended, and that's all she did, she recommended alternate placement protection. She didn't do nothing. Well, it seems like it's difficult to say which defendants might have been liable and which weren't, because I guess it would take further determination by the court. But I don't know that the court would need to do that, or the district court was wrong in not doing that, because I think the district court has to take the facts in the light most favorable to Fierro, which you just acknowledged. So arguably, it seems like the threat was obviously, obvious after the first assault or the fight, I guess. And so even officers involved in the first PCE denial could arguably have acted with deliberate indifference to substantial risk of serious harm. Isn't that true? But the risk wasn't obvious. The statewide threat and the gang connection was not obvious. Again, these officials, they had a body of information that was presented to them. I think your position, including for Ochoa, is that the state, each of these officers did exactly what the Arizona prison regulations required them to do, which was an investigation, and they determined that there was no statewide threat, and they didn't believe the subjective element. They didn't believe there was a threat as to him. Isn't that correct? Yes, Your Honor. But just, you know, there's a problem with that. The problem is that there's some evidence in the record which impugns the credibility of your witnesses. The security, let me get the exact name here, the special services unit at ER 295-147 says, this is inmate Fierro's seventh request for PC, for protective custody. All of the requests have been related to the STG Border Brothers. Bottom section SSU, which is the special services unit, has determined this could be a STG related. There is no documentation in this packet which indicates Fierro's statements have been checked out and either confirmed or not confirmed. That sounds to me like they didn't do everything that the prison regulations required, and therefore they are contradicting themselves, and therefore they can be found not to be credible when they say they did everything and did not know subjectively there was a risk to Mr. Fierro. And for purposes of summary judgment, if there's a dispute in the evidence, summary judgment should not be granted. Your Honor, could you give me that that reference just one more time? I apologize. Yeah, 295-147. You can sit down and talk to me when you get back. Let me do that. And when I get back, I'd like to address the second problem of the analysis. Thank you. Good morning, Your Honors. Good morning. And may it please the Court. Suzy Vardonian, certified law student under the supervision of Mary Christine Sangaila for Jose Abel Fierro. I will be splitting my time with my colleague who will address the clearly established prong of qualified immunity while I discuss the first prong, which is whether Mr. Fierro's constitutional right was violated. So I would like to reserve eight minutes for my time and cede the rest to my colleague. This case involves a pro se plaintiff, Mr. Fierro, who brought the present action alleging that his Eighth Amendment right was violated after prison officials failed to grant him protective custody on six prior occasions after being assaulted and threatened by at least eight members of the Border Brothers at about five different facilities, including a cellmate who was a leader of the gang, until he was severely— No, no, no, wait a minute. I don't—I think you're saying something which may not be borne out by the record. He was assaulted on two occasions, not on each of the occasions. When he—he was given—he was transferred from one facility to another facility on five occasions without any incident, right? Oh, I understand. I think I know—I meant that he was assaulted on some occasions and threatened. So he was either threatened or assaulted at least in at least five facilities and by at least eight members of the Border Brothers. But the assaults that you're pointing out to, yes, there was the—the one leading up to the first request by a cellmate, Nieto, and then the one leading up to the second request, which actually involved one assault by a leader of the Border Brothers, which was Mr. Molina Gasolum, and then right after he informed other Border Brothers to assault him— Well, after the second request, he was moved third, fourth, fifth, and sixth without any assault, right? But with threats. With threats. All right. And some of the threats were verbal, and the only reporting person was Fierro himself. Um, there were actually notes. Mr. Fierro mentioned during the third request that he received a note that said, leave the yard or get stuck, by someone named Flacco, who was a Border Brothers member. Were the notes produced? Did they—did the officers see those notes? Or—it's kind of confusing—or not confusing, it just wasn't clear in the record if there were physical notes. I understand. So, in one of the instances, in, um, during his fifth request in that file, Mr. Fierro actually did produce a note by La Raza, another gang, who alluded to the fact that they knew about his problems with the Border Brothers. So that note is actually in the record. It's at ER-295-111. And why aren't the other notes in the record? And the other—well, Mr. Fierro, whose, um, account has to be taken, um, you know, as true for the—for purposes of summary judgment and for this interlocutory appeal, he actually said that the reason why the other note isn't there is because prison officials actually didn't put it there, even though he did—even though it was, um, given to them. So, that's one instance. And also, there is, um, a declaration that corroborates his account by Alan Warner. So, as we see it, um, he—he says that he witnessed, uh, the beating that occurred following—that led to the second request. Ms. Vardanian, you said something that made me think. You say we have to accept what Mr. Fierro says as true. Do we? I mean, for instance, wouldn't the prison authorities be perfectly within their power to doubt the credibility of Mr. Fierro, as one of them on the fifth request said, he's trying to manipulate us because he'd rather be in PC than he is in the, uh—and moved to another facility? Can't—can't they make that as a good faith determination? So, here where you have, um, competing facts, so we have Mr. Fierro's account and the accounts of— On the element of subjective recognition of a substantial risk, cannot the prison officials say, we subjectively did not appreciate that he had a substantial risk because we thought he was trying to manipulate us? Right. I understand now, Your Honor. So, we actually—Mr. Fierro can present circumstantial evidence that shows their subjective awareness, so we don't have to take the prison officials' testimony as true. And in this case, even if the prison officials do say that they didn't believe there was a risk, there is evidence that he is—that Mr. Fierro has provided that suggests that it was—that they must have known of the risk. What evidence is that that they must have known? That no reasonable person could find other than they must have known? Right. So, he—so, each defendant was actually able to review his entire file. So, his file, this included the first request where he had his first encounter with the Border Brothers in January 2011. And this is where he, uh, got into a fight with Mr. Nieto. Um, the opposing counsel says that this was just an altercation where he broke his hand. But, in fact, Mr. Fierro says that it's because—and he did actually include this in his file—that they called him a rat and a snitch. And, um, and that is why the—this is what started his problems with the Border Brothers. Next, there is evidence that, um, again, he—he was in a fight with Molina Gasolum, who was the head of the Border Brothers. And prison officials actually knew this because he was in their system. He was labeled a Border Brothers suspect. And I believe Mr. Deputy Warden Schuster actually noted it when he recommended protective custody. And that's actually quite—Mr. Schuster's recommendation is also quite probative of the fact that they did, in fact, have substantial—subjective awareness of the risk. Um, he recommended P.C. protective custody because he, um, he reported getting this note that said, leave the yard or get stuck. He also noted that his—his problems about, um, that they started with this fight with the Border Brothers in the Camarón unit. He also noted that Mr. Fierro had extensive bodily injuries, um, and that he was not able to defend himself because of his medical problems. And these were all present in his entire file. So each defendant actually had the opportunity to review all of this information. And so is that your response to the individualized—the—the failure of the District Court to individualize the assessment here? Yes, Your Honor. So, um, even though they were reviewing individual requests, but in reality, the—the request included this whole file that had a previous history. And their own policy says that they have to look at, um, the entire file and look at his history and see if it was STG-related, which in this case—so he was targeted by a recognized security threat group, which was the Border Brothers. It was known that the Border Brothers actually permeated the entire 80s—the Arizona Department of Corrections, and that they were present throughout the general population yards. So, um, to say that it was an individual risk—uh, individualized response is a little bit misleading because even if it is a case-by-case, each defendant had to look at each case individually, they still had to take into account the particular risk that he faced. And the particular risk wasn't against one person, one, um, gang member or another. It was actually this whole gang that had targeted him. And there was plenty of evidence to suggest that. Do you want to keep your eye on time? Yes, ma'am. Um, so I will quickly just address the reasonableness. Um, as I pointed out, because of the risk here, because the risk that Mr. Fierro faced was, um, that he was targeted by the Border Brothers and he was labeled a snitch, there is plenty of evidence from which a reasonable jury could find that the risk—the defendant's response was unreasonable. Um, they—as I mentioned, the—this—the Border Brothers were present throughout the population—the general population yards of the prison. There was lack of evidence to show why they couldn't grant him protective custody. There is nothing in the record that suggests protective custody was not feasible. And, um, the fact that he was actually at the Florence Central Unit, where—which was a maximum custody unit, that in many ways mimicked what protective custody would have been like. And the fact that he wasn't assaulted there is actually probative of the fact that he would have been safe in protective custody since the condition—conditions would have been very similar to Florence Central Unit. All right. Thank you very much. Thank you, Your Honors. Good morning, Your Honors. Daniel Siebold, certified law student under the supervision of Mary Christine Sangaila. Since the Farmer and Robinson decisions decades ago, the U.S. Supreme Court and this circuit have made clear that prison officials violate the Eighth Amendment when they fail to take reasonable measures to protect an inmate from a known and credible threat of safety. And does the Supreme Court's recent decision in Casella affect this standard? Uh, no, we don't believe so. Um, the Supreme Court decision, which was a Fourth Amendment case, um, actually, uh, we don't believe it changes that, uh, analysis. As the Court noted, specificity in Fourth Amendment cases is especially important, and it seems to suggest a higher standard, um, in the Fourth Amendment context. And really, um, even under that high standard, through—through Farmer and Robinson, and, um, this Court's decisions in—unpublished decisions in, uh, Leach v. Drew and Swan v. Hernandez, you know, we've seen those principles applied to facts that are particularized to this instant case. Um, and it's not only in this, uh, this circuit where we've, uh, found clearly established law using the Farmer principle. Um, courts in, uh, the Third, Tenth, and Eleventh Circuit have all addressed similar, um, similar questions to that, uh, faced here, and have held that prison officials violate the Eighth Amendment when they, uh, fail to protect an inmate by making a recommendation or decision that leaves him exposed to a threatening gang with a pervasive, um, presence within the facility. So your best case, are you relying on Farmer? Farmer and Robinson, uh, we believe, uh, do, uh, shape the contours of the right, uh, sufficiently definite, uh, which is required by this, uh, by this Court. But, uh, there's a distinction, I guess, in, in Farmer from this case because in, in, in Farmer, I don't think they moved him, uh, at all. Uh, here, they did a modified sort of review, uh, and, uh, put, didn't give him protective custody, but put him in this, uh, other alternative placement. You know, Your Honor, um... So I guess why wasn't that reasonable? And is there a clearly established law on this? Well, I, I think, um, your question there wasn't reasonable. I think, I think you're correct, correct in, um, uh, that is the question, and I think that really goes more toward the constitutional violation question. Um, and, um, the other point I'd like to make really is that alter, alternative placement in this, um, situation didn't address the specific threat coming from the Border Brothers. The Border Brothers, and this is not, um, in, in the record, but the Border Brothers, as, uh, pointed out in the, um, Arizona Department of Corrections, um, website, is the biggest gang, the fastest growing, um, uh, STG within the Arizona Department of Corrections that has... STG, you mean? Security Threat Group, which actually, um, also not in the record, but on the, um, Arizona Department of Corrections makes a distinction even between, um, just regular gangs and, uh, STGs, which, um, show STGs as further dangerous, more dangerous than gangs, and I, I believe they described as blood in, blood out, and they're known for targeting individuals. How does this case not look like a decision made through the retrospectoscope after he's injured that the Department of Corrections individuals made mistakes, were negligent, as opposed to being deliberately indifferent, because we pointed out here in all the questioning and the answers that there was, uh, an extensive review, so I'm, and, and a decision made after several layers of review and in compliance with the state procedures, so if you had to crystallize for us what is the clearly established law on deliberate indifference as to this, the factual scenario, what would it be, because Robinson is a completely different set of facts. Yes, Your Honor. Um, well, first I'd like to say that, um, and, and the, um, the appellant says, uh, make this, uh, kind of mistaken, uh, uh, argument as well that they followed their policy and, and, and, and that they really, truly investigated these, uh, these, uh, these threats. So it's the argument they didn't really investigate, and that's a question of fact as to whether they conducted the investigation? Is that the, the crystallization of the specificity issue here? Well, I believe that goes to whether they were, um, whether or not they were deliberately indifferent, and there's, uh, you know, I believe, uh, uh, one of your colleagues pointed out, um, that... Deliberate indifference is a pretty high standard, right? That's correct, and we believe that, um, you know, the principle espoused in both Farmer and Robinson applies, um, with obvious clarity to instances, um, in... Well, Robinson, they're standing around watching a fight, letting it happen, they don't intervene until much later, right, after injury? That's correct, and, um, uh, this circuit also applied it in the unpublished case Leach v. Drew, um, and also the, uh, case, um, in Swan v. Hernandez, holding that, um, you know, not granting protective custody under certain circumstances, like the ones here, where they know of a credible threat from a gang, um, you know, and, and they, and they don't take effective measures to remove him from the reach of that gang, they violated, and they've, they've met that high standard of being deliberately indifferent. So they took measures, and you say they were not enough, they were therefore not effective, and that's more than negligence, that's deliberate indifference. Uh, that's correct, Your Honor, it didn't, it didn't address... Which case says that? Um, Your Honor, I believe that, um, the cases, uh, especially out of state, uh, the Howard v. Wade from the Tenth Circuit, Hamilton v. Levy from the, um, from the Third Circuit, and the Rodriguez v. Secretary of the Department of Corrections in the Eleventh Circuit all stand for that proposition that simply moving a, a, an, an inmate isn't enough, and, uh, if you're leaving him in the, within the reach of the gang, that is, you, you have to address the specific harm that is facing the, um, the, the inmate. So under the clearly established standard, you've cited cases from out of the circuit? That's correct, which, um, as, uh... How does that work under, under the case law? Yes, Your Honor, uh, the U.S. Supreme Court... Individuals would have known. Yes, Your Honor, um, and I am, I see I'm out of time. May I answer? Yes. Uh, yes. Um, the U.S. Supreme Court in Ashcraft v. Al-Kidd actually addressed this issue and said that absent binding authority, you look to the robust consensus of cases of persuasive authority. This circuit has also held, um, explicitly in Prison Legal News v. Lehman that, um, this, this court does look to, um, all decisional law, including state law, uh, law from other decisions from, uh, from, from, from decisional law. Thank you, Mr. Zeebo. You've run out of time. Thank you very much. All right. Rebuttal? Yes, Your Honors. Thank you. Um, just a couple of points. Uh, Mr. Gastelum was not the head of the Board of Brothers. He was a Board of Brothers suspect. That is in the record. Um, maximum custody, uh, does not necessarily mimic, mimic protective custody. Protective custody can be minimum custody. It can be medium custody, close custody or maximum custody. With regards to the, um, ER-295-147 that, uh, that Your Honor Judge Bea, um, brought up, um, that was an email from the protective custody administrator after the final assault when Mr. Fierro, I believe was at the Cimarron unit. Um, she was writing back to the special security unit saying, hey, I don't see where you've got any documentation showing that there's a confirmed threat, that there's a confirmed statewide threat. Confirmed or not confirmed? A confirmed statewide threat. She didn't have any documentation from SSU that there was a confirmed threat. She's saying, go back and do a reinvestigation. I need some more information from you. That- But that doesn't cut against the idea that, uh, the officers did everything that the Arizona prison regulations required? I don't believe it does, Your Honor, because- Tell me why. Because when they came back with the information that they came back with, they didn't have any more. They told her, we're only saying that we think that there's a statewide threat because he was assaulted so quickly after he- It seems to me that part of the Arizona regulations is to confirm or not confirm the threats by- and document them. The threat wasn't confirmed. The threat isn't confirmed to this day, Your Honor, that there has never been a confirmed threat. It would have been better had they not confirmed the threat in writing, but they didn't. They didn't. They, they said that, that they said, we think that there might be a threat. You are correct, Your Honor. Substantial threat statewide to Fiero. And Your Honor, that only goes to that last, that, that very last, um, um, review. That doesn't go to all the subsequent reviews or all the previous reviews. Because they didn't document whether the threats were confirmed or not confirmed. They did document that the threats were not confirmed. That they could not, that they not, they could not confirm a statewide threat or a gang affiliation. They, they did document that, Your Honor. They didn't document it until they were called up. No, it's different when they were called up because when they were called up, Your Honor, she asked them, you're saying that you think there is a confirmed threat. I need you to give me what it is that confirms that threat. That's what I'm trying to say. On that last review, they went back, the special security unit went back to the administrator and they said, we think there's a threat. We think there may be a statewide threat. She went back to them and said, you need to give me more. I can't go by you just thinking there's a threat. They came back to her and they said, that's all we've got. We can't confirm a threat, but we think there's a good chance that there's a threat because he was attacked so, so soon after he arrived on the yard. Back to the place where he had first been attacked. It wasn't the place he had first been attacked. And they actually sent him all the way back to where he was first attacked. Not these defendants, Your Honor. Not these defendants. Could I- What do you mean, not these defendants? These defendants didn't send him back to those yards. I go back to Ochoa. Ochoa was involved, her involvement ended when she recommended alternate placement. That's when her involvement ended. She didn't transfer Mr. Fierro anywhere. She didn't have any input into where Mr. Fierro may be transferred to. In fact, she retired about two months after the first Cimarron incident. If I could briefly just address the second prong. I'm way out of time here, but it'll take me about 30 seconds if you can let me do that. Go ahead. No court, my colleagues talked about Farmer and Rodriguez. No court has ever, ever discussed or fleshed out when recommending or when not recommending protective custody over some alternate method of protection becomes unconstitutional. So in a case like the one where we have here, where prison officials were presented with a body of information, conflicting information, and that information didn't scream out for protective custody, they could not have known that recommending alternate placement was unconstitutional. Because the case law has never addressed it. It's never addressed it in this set of circumstances. The case law has never addressed what? When it becomes unconstitutional to recommend, to not recommend protective custody over say alternate placement. Pretty clear. It's when there's an objective and a subjective acknowledgement of substantial risk of serious bodily harm to the inmate. Yes, Your Honor, but the only case law that's out there, it addresses the obvious cases. And so you're saying this is not an obvious case? I don't believe this was an obvious case. It moved him six times and it wasn't an obvious case that he was being threatened? It wasn't an obvious case that there was a statewide threat against Mr. Fierro, a statewide threat and a gang related threat. It wasn't obvious because SSU never was able to confirm that. Well, but SSU certainly suggested it, didn't they? No, they didn't, Your Honor. Bottom section SSU has determined this could be an STG related. Your Honor, that's after the last assault on his last yard. That's one review. That was the one review that was done in response to that particular assault. Okay, we've taken you past your time. Thank you very much. Thank you very much. Okay, and now we go to the last case on today's calendar, which is Jody R. O. Carr v. Corporal Stelzer, et al.
judges: Bea, Murguia, Keeley